# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

EDDIE MILLER,
    Plaintiff

Case No. 1:08-cv-492
Hogan, M.J.

vs

PNC BANK, N.A., et al.,
    Defendants

**ORDER**

Plaintiff Eddie Miller brings this action through counsel against defendants PNC Bank,

N.A., Donna Haynes, and Sally Weinkam alleging claims of race discrimination, hostile work

environment, and retaliation in violation of Ohio Rev. Code § 4112.02(A) and Ohio Rev. Code

§ 4112.99, and a violation of the Family Medical Leave Act, 29 U.S.C. § 2601 et seq. Plaintiff's

complaint was initially filed in the Hamilton County, Ohio Court of Common Pleas and

thereafter removed by defendants to this federal court. (Doc. 1). This matter is before the Court

on defendants' motion for summary judgment and memorandum in support (Docs. 21, 22),

plaintiff's memorandum in opposition (Doc. 23), and defendants' reply memorandum. (Doc. 24).

A motion for summary judgment should be granted if the evidence submitted to the court

demonstrates that there is no genuine issue as to any material fact and that the movant is entitled

to summary judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S.

317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving

party must demonstrate the absence of genuine disputes over facts which, under the substantive

law governing the issue, could affect the outcome of the action. *Celotex Corp.*, 477 U.S. at 323.

In response to a properly supported summary judgment motion, the non-moving party "is

required to present some significant probative evidence which makes it necessary to resolve the

parties' differing versions of the dispute at trial." *Sixty Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987); *Harris v. Adams*, 873 F.2d 929, 931 (6th Cir. 1989). "[A]fter a motion for summary judgment has been filed, thereby testing the resisting party's evidence, a factual issue may not be created by filing an affidavit contradicting [one's own] earlier deposition testimony." *Davidson & Jones Dev. Co. v. Elmore Dev. Co.*, 921 F.2d 1343, 1352 (6th Cir. 1991).

The trial judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine factual issue for trial. *Anderson*, 477 U.S. at 249-50. The trial court need not search the entire record for material issues of fact, *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989), but must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

If, after an appropriate time for discovery, the opposing party is unable to demonstrate a *prima facie* case, summary judgment is warranted. *Street*, 886 F.2d at 1478 (citing *Celotex* and *Anderson*). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## I. Facts

Plaintiff Eddie Miller, who is African-American, began his employment with defendant PNC on June 20, 2005 as a Licensed Financial Sales Consultant II. He was responsible for selling PNC products, services, and non-deposit investment products to customers. Defendant Donna Haynes was a Branch Manager and was plaintiff's direct supervisor at the Brentwood

2

Branch of PNC Bank. Defendant Sally Weinkam was an Employee Relations Representative for PNC Bank.

Plaintiff's spent his first three months (June through August of 2005) in training. On December 7, 2005, plaintiff had a meeting with defendants Haynes and Weinkam and given a written warning about his job performance. He was cited for his "poor revenue production" and "customer and coworker complaints" about keeping customers waiting, failing to return customer phone calls, and failing to follow up on sales leads. Plaintiff was advised that a failure to show improvement could result in further corrective action including termination of employment.

Plaintiff states the warning was "like a bolt out of the blue." (Doc. 23, Exh. G, ¶3). He states he had received no verbal warning or any indication from anyone that there were problems with his handling of customers or other complaints. He states that neither defendant Haynes nor defendant Weinkam had any specific examples of his poor performance to guide him in taking corrective action. (Doc. 23, Exh. G). He states there is no factual basis for the complaints alleged in the written reprimand. *Id.* He also states that the day after he received the written reprimand, he received notice that he was one of the top revenue performers for November and December of 2005. (*Id.*; Doc. 23, Exh. A).

Following this meeting, plaintiff raised allegations of harassment. PNC investigated the allegations but found no evidence to support plaintiff's claims. (Doc. 22, Exh. F).

In the months of January and February 2006, plaintiff received awards for being the top sales performer for those months. (Doc. 23, Exh. A).

Plaintiff states that on March 29, 2006, defendant Haynes, his immediate supervisor, came into his office and stated, "This is not working out. You and I don't get along. You're

3

obviously not happy here and we're not happy with you. For the good of all of us you need to quit." (Doc. 23, Exh. G). Plaintiff states he was "absolutely floored" by Haynes' statements because he had been getting merit awards for his good sales work. *Id.* Plaintiff states that Haynes continued to "badger" him for the rest of the day about resigning, but he refused to quit. *Id.* Plaintiff attests that was never previously advised that his work was poor, that he could not get along with coworkers, or that he needed to quit for his own good. *Id.*

Two days later, on the morning of Friday, March 31, 2006, plaintiff was accused of taking credit for a sale he did not deserve. Plaintiff Miller states that on that morning, defendant Haynes called fellow employee Christine Demann and Assistant Manager Millie Stall into the break room. Shortly thereafter, Demann entered plaintiff's office screaming, "You thief. You stole my customer. Millie and Donna told me you stole my customer." (Doc. 23, Exh. G). Plaintiff testified that Demann demanded the check that the customer brought to the bank. (Doc. 22, Miller Depo. I at 131). Plaintiff states he did not "steal" the account, but assisted a customer brought to him by Assistant Manager Stall. Plaintiff states that Stall advised him the customer had no one to help him, no account with the bank, and that plaintiff should take care of him. (Doc. 23, Exh. G). Plaintiff subsequently obtained a letter from the customer indicating that the customer had not previously dealt with Ms. Demann on any banking transactions and that plaintiff Miller did not try to retain him as a client. (Doc. 23, Exh. B). Plaintiff attests that he did not raise his voice or argue with Ms. Demann. (Doc. 23, Exh. G). Plaintiff states the conversation with Ms. Demann got completely out of hand. Plaintiff went to defendant Haynes and asked for help, but she refused to intervene. (Doc. 23, Exh. G). Plaintiff states he became so upset over the shouting, tumult, and lies that he felt he could no longer hold himself together

4

emotionally. *Id.* He attempted to call PNC Bank's Employee Assistance Program (EAP), but was unable to get through. He then left the office and again telephoned the EAP and spoke with EAP personnel. (Doc. 23, Exh. C, G). Plaintiff did not return to the office that day. He suspected that he was being "set up" so that Haynes and Stall could get rid of him. (Doc. 23, Exh. G).

Defendants characterize the actions of March 31, 2006 as plaintiff walking off the job without permission.

That night plaintiff Miller emailed defendant Weinkam claiming he was being "harassed and mistreated." (Doc. 22, Miller Dep. l, Exh. 17). He described the workplace environment as "hostile" and that it was having a detrimental effect on him. The email indicated he wished to speak with Weinkam on Monday before returning to the bank. *Id.*

Following the email of March 31, 2006, plaintiff did not return to the Brentwood branch. On April 5, 2006, the following Wednesday, plaintiff emailed defendant Weinkam and informed her he was out on medical leave. On April 10, 2006, plaintiff emailed copies of his doctor's notes which excused him from work for two weeks. Several subsequent doctor's notes extended the period of absence. (Doc. 22, Exh. D).

On May 10, 2006, plaintiff emailed Weinkam informing her he had been released by his doctor to return to work on May 15, 2006. Weinkam instructed plaintiff to report to her office on May 15 because she was conducting an internal investigation in response to his March 31 email complaining about harassment and mistreatment.

Plaintiff met with Weinkam on May 15, 2006. Weinkam attests that plaintiff provided no details and supplied no facts supporting his assertions of mistreatment or harassment. (Doc. 22,

5

Exh. D). At the end of the meeting, Weinkam placed plaintiff on paid administrative leave pending the continuation and outcome of her internal investigation. *Id.*

Weinkam states that her investigation revealed no evidence to support plaintiff's claims. She states that according to her investigation, plaintiff lost his temper, yelled at a co-worker, loudly complained he was not treated with respect, and walked off the job on March 31, 2006. (Doc. 22, Exh. D at ¶8). Weinkam also states that plaintiff would not cooperate with her investigation. He failed to respond to her questions, avoided her phone calls, and refused to discuss certain issues he felt were unimportant to the investigation. (Id. at ¶¶8-9).

Weinkam states that on June 16, 2006, she asked plaintiff to meet with her that afternoon to discuss the findings of her investigation, but he refused. When subsequent calls to schedule an alternate time went unanswered, she left plaintiff a voicemail message for plaintiff to report to PNC's Northgate office the following Monday, June 19, 2006. (Id. at ¶10).

At the June 19th meeting, at which plaintiff, Weinkam, Haynes, and Regional Manager W. David Pendl were present, plaintiff was presented with a written warning concerning his March 31 behavior. (Doc. 22, Miller Dep., Exh. 18). The written warning stated that plaintiff's behavior on March 31 was unprofessional. The warning stated that after a co-worker asked about a customer's check for deposit, Miller became angry, raised his voice, and made unprofessional comments to coworkers in front of clients. The warning further stated that Miller refused to come into his manager's office to discuss his concerns and walked out of the branch without returning to work or calling in to explain his absence. *Id.* Weinkam explained the reasons for the warning and at the completion of the meeting, plaintiff was taken off paid administrative leave

and was advised he was expected to return to work that day. (Doc. 22, Exh. D, F). Plaintiff did not return to work on June 19.

On June 20, 2006, plaintiff sent Weinkam an email informing her he was back on medical leave. (Doc. 22, Miller Dep. I, Exh. 25). That same day, plaintiff sent Weinkam an email and accused her of mistreating, antagonizing, harassing, and making false claims and accusations against him. (Doc. 22, Miller Dep. I at 184-85, Exh. D). He requested that another PNC Employee Relations Representative be assigned to investigate his claims of harassment. PNC granted the request and assigned Peggy Atkinson to investigate on or about June 20, 2009. (Doc. 22, Miller Dep. I at 183, 186, Exhs. C, G). Atkinson states, "Initially, Miller did not answer my phone calls, nor did he return my calls. When I finally reached Miller, he did not want to speak with me." (Doc. 22, Exh. G).

On June 21, 2006, plaintiff faxed PNC a doctor's note extending his leave. (Doc. 22, Miller Dep. I at 187-88). The letter from Dr. Samir Mayel requested that plaintiff be excused for seven more days since he would be starting on new medications and seeing his therapist. (Doc. 23, Exhs. G, E). Plaintiff states he faxed the letter to Peggy Atkinson, who called and accused plaintiff of falsifying the document instead of asking whether he needed FMLA leave. (Doc. 23, Exh. G at ¶13). Plaintiff states he later asked that leave be counted as Family Medical Leave Act time off, but it was never granted. (Doc. 23, Exh. G at ¶2).

James Popp, Employee Relations Manager at PNC, then attempted to contact plaintiff by telephone. He states plaintiff did not take his calls or return his messages. On the morning of June 23, 2006, plaintiff sent an email to Popp advising that he would be unable to return Popp's phone call since he had a doctor's appointment. (Doc. 22, Miller Depo. I at 198, Exh. 27; Doc.

7

23, Exh. F). In the email, plaintiff requested that all communication with PNC be in writing through email. *Id.* Plaintiff stated that he had been singled out and targeted by management and the HR Department after he requested help. *Id.* Popp replied and requested plaintiff call him so he could speak directly to plaintiff about several items. (Doc. 22, Miller Depo. I, Exh. 28). Later that day, Popp received another email from plaintiff explaining his request that all communications be in writing. Plaintiff stated that "whenever [he] answer[s] questions orally, somehow the PNC Representative seems to misunderstand, misconstrue, and misapply my statements." (Doc. 22, Exh. C, attachment). Plaintiff states he became "very cautious" as a result and determined the safest course was to place everything in writing. (Doc. 23, Exh. G at ¶12). Plaintiff's email expressed his "desire to fully cooperate with any questions or concerns PNC may have." The email goes on to address the questions left by Atkinson's phone message. The email states:

Peggy [Atkinson] said that Sally [Weinkam] told her I could not work on Friday, June 16, or Monday, June 19th. That is not true. Sally ask (sic) to meet with me Friday at 1 p.m., I had a doctor's appointment and asked if there was another time we could meet perhaps Monday. She said that was unacceptable. I offered a phone conference later that day. She then said she would call later. On Monday she asked if I could meet with her at 10:30 a.m. I agreed. She did not tell me that I would be returning to work. I had another doctor's appointment that afternoon. (If you need proof of this I have the receipts to show dates and times.)

*Id.* Plaintiff then described the mental and emotional stress from his experiences at PNC and the problems he experienced with the operation of his fax machine on various days:

Concerning the statement of using the fax machine. Peggy wanted to know why I could use my fax machine on Wednesday, June 21st and not on Tuesday, June 13, 2006. This is a matter of oral communications once again being misconstrued and misinterpreted. Answer: I have been having problems with my fax machine. Some days I can get it to cooperate some days I cannot. However the fact of the matter is that I did provide the information that Sally requested that same day!! What more can you ask of me.

8

*Id. See also* Doc. 22, Miller Depo. I at 199, 210, 213.

On June 27, 2006, Popp spoke directly with plaintiff Miller by phone. Popp states that

during the conversation, he "discovered numerous contradictions and discrepancies between

Miller's representations and what I had learned from Weinkam and Atkinson." (Doc. 22, Exh.

C). Popp states:

> My investigation revealed that Miller refused to meet with Weinkam on June 16,
> 2006, and he failed to give a reason for his refusal. I also learned that Miller
> refused to cooperate with Weinkam in her efforts to schedule a meeting. Miller
> reported to me that he told Weinkam that he had medical appointments he needed
> to attend, but that she had declared his excuses to be unacceptable.

> Miller also distorted and misrepresented what happened at a June 19, 2006
> meeting between Miller, Weinkam and Branch Manager Donna Haynes. Miller
> falsely informed me that, at the meeting, Weinkam insisted that he cancel his
> medical appointments so that he could begin working and also that he not take his
> prescribed medications.

> My investigation revealed that Miller repeatedly stymied Weinkam and
> Atkinson's attempts to investigate his claims by avoiding their calls and not
> returning their messages, and failing to provide medical documents to support his
> continued leave when requested.

(Doc. 22, Exh. C at ¶12). Both Weinkam and Haynes denied that at the June 19th meeting

Weinkam insisted or suggested that plaintiff cancel his doctor's appointment or stop taking his

medications so he could return to work. (Doc. 22, Exhs. A, D). Popp determined that plaintiff

had violated PNC's policies requiring honesty and cooperation, and concluded that as a result of

Miller's misrepresentations and consistent refusal to communicate or cooperate with anyone

from the Employee Relations Department during the internal investigation he was no longer

eligible to be employed by PNC under its Bonding Requirements Policy. (Id. at ¶13). Plaintiff

was advised on July 7, 2006 that he was discharged on the basis of the results of the internal

investigation. (Id. at ¶14).

9

Plaintiff attests that he "has never distorted nor misinterpreted deliberately what PNC's staff have stated." (Doc. 23, Exh. G at ¶12).

Plaintiff presents the affidavits of two former African American employees of PNC's Brentwood branch. Cynthia Stevens, a former bank teller, attests that she worked with plaintiff Miller. She states that plaintiff was easy to get along with, took very good care of the staff and customers, and trained and assisted the tellers with good sales techniques and how to identify quality referrals. She states several customers spoke highly of plaintiff after he assisted them. Stevens attests that "Donna Haynes told the tellers not to refer consumer loans and investments to Miller but to white employees instead." (Doc. 23, Exh. H). Stevens attests that Haynes "would conjure of 'complaints' supposedly from customers to try to damage the reputation of black employees, and to use such for disciplinary action against them." *Id.* Stevens also attests that "[w]hites were allowed to transfer out of the bank while blacks were not. The environment was racially charged, which led to a high turnover of black employees. It was well known that if blacks complained to Human Resources Representative, Sally Weinkam, who was known to be Donna Haynes' friend, that you would be treated worse." *Id.*

Plaintiff has submitted the Ohio Civil Rights Probable Cause Determination stemming from charges filed by Cynthia Stevens against PNC. (Doc. 23, Exh. H). The OCRC determined that the reason for Ms. Stevens' termination of employment on July 25, 2006, *i.e.,* dishonesty relating to her absences from work, was pretextual and that PNC engaged in racial discrimination and a pattern of retaliatory acts against Ms. Stevens. *Id.*

Plaintiff also submits the affidavit of Merle Houston, a former African American employee with the PNC Brentwood branch. (Doc. 23, Exh. I). Mr. Houston was a licensed

10

financial sales consultant who worked at PNC prior to plaintiff Miller. He attests that African American financial consultants who achieved higher sales figures than their white counterparts were given unfavorable evaluations for failure to meet revenue credit. *Id*. He also states that he heard the word "nigger" used at the Brentwood branch, and after he complained to the Human Resources Department of PNC he was treated worse. *Id*. He states that manager Donna Haynes "trumped up false charges of complaints from co-workers, customers, and about [his] performance even though he was one of the top sales persons." *Id*. He states that Haynes went to the Human Resources Department over these charges without discussing the matters with him. *Id*. He states that Haynes and Human Resources Representative Sally Weinkam were close friends and "this affected her judgment and investigations at the Brentwood Branch." *Id*. He attests, "It was well known by blacks that if you made a complaint, there would be repercussions against you." *Id*.

## II. Defendants are granted summary judgment on plaintiff's hostile work environment claim.

Plaintiff's complaint alleges a hostile work environment claim against defendants. (Doc. 3, ¶1). Defendants seek summary judgment on this claim. (Doc. 21 at 11). Plaintiff has failed to respond to or dispute defendants' motion in this regard. Since it appears that plaintiff has abandoned his hostile work environment claim or otherwise failed to respond and create a genuine issue of material fact necessitating a trial on this claim, *Bradley v. Mary Rutan Hosp. Assoc.*, 322 F. Supp.2d 926, 932 n.7 (S.D. Ohio 2004), summary judgment is granted for defendants on plaintiff's hostile work environment claim.

**III. Defendants' motion for summary judgment on plaintiff's race discrimination claim is granted because plaintiff fails to present evidence establishing a prima facie case of discrimination.**

Plaintiff claims he was discriminated against on the basis of his race in violation of state law. The Ohio Revised Code forbids the termination of an employee on the basis of color, religion, sex, military status, national origin, disability, age or ancestry. Ohio Rev. Code § 4112.02. The standards for establishing a discrimination claim under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, are equally applicable to plaintiff's claims under Ohio Rev. Code § 4112. *See Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 n.2 (6th Cir. 2000); *Mitchell v. Toledo Hospital*, 964 F.2d 577, 582 (6th Cir. 1992).

Plaintiff's race discrimination claim is analyzed under the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Policastro v. Northwest Airlines, Inc.*, 297 F.3d 535, 538 (6th Cir. 2002); *Mitchell*, 964 F.2d at 582. The *McDonnell Douglas* burden-shifting analysis requires that plaintiff first establish a *prima facie* case of discrimination. *Id.* Plaintiff may establish a *prima facie* case of discrimination either by presenting direct evidence of intentional discrimination by defendants, *Terbovitz v. Fiscal Court*, 825 F.2d 111, 114-15 (6th Cir. 1987) (citing *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985)), or by showing the existence of circumstantial evidence which creates an inference of discrimination. *McDonnell Douglas*, 411 U.S. at 802. *See also Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1246 (6th Cir. 1995). Plaintiff may establish a *prima facie* case of race discrimination by showing: (1) he is a member of the protected class; (2) he suffered an adverse employment action; (3) he was qualified for the position lost; and (4) he was replaced by someone outside the protected class. *McDonnell Douglas Corp.*, 411 U.S. at 802; *Gray v.*

12

*Toshiba,* 263 F.3d 595, 598 (6th Cir. 2001); *Ercegovich v. Goodyear Tire & Rubber Co.,* 154

F.3d 344, 351 (6th Cir. 1998); *Manzer v. Diamond Shamrock Chemicals Co.,* 29 F.3d 1078, 1081

(6th Cir. 1994). "In disparate treatment cases, the fourth element may be replaced with the

requirement that the plaintiff show [he] was treated differently from similarly-situated

individuals." *Policastro,* 297 F.3d at 539 (citing *Mitchell,* 964 F.2d at 582-83). Such proof "in

effect creates a presumption that the employer unlawfully discriminated against the employee."

*Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 254 (1981). Defendants are entitled

to judgment if plaintiff does not establish a *prima facie* case. *Mitchell,* 964 F.2d at 582-84.

Once plaintiff has presented evidence sufficient to establish a *prima facie* case of

discrimination, the burden of production shifts to defendants to articulate a legitimate, non-

discriminatory reason for the adverse employment action. *Burdine,* 450 U.S. at 253; *McDonnell*

*Douglas Corp.*, 411 U.S. at 802.

If defendants meet this burden, the burden of production shifts back to plaintiff to

demonstrate that defendants' articulated reason is merely a pretext for unlawful discrimination.

*Burdine,* 450 U.S. at 253; *McDonnell Douglas Corp.*, 411 U.S. at 804. In other words, plaintiff

must show that the proffered explanation is unworthy of credence or that defendants were more

likely motivated by a discriminatory reason. *Manzer,* 29 F.3d at 1082. There must be "a

sufficient basis *in the evidence*" for rejecting an employer's stated explanation for its action.

*Manzer,* 29 F.3d at 1083 (emphasis in the original):

> To make a submissible case on the credibility of his employer's explanation, the
> plaintiff is required to show by a preponderance of the evidence either (1) that the
> proffered reasons had no basis in fact, (2) that the proffered reasons did not actually
> motivate his discharge, or (3) that they were insufficient to motivate discharge.

13

*Id.* at 1084 (internal quotations and emphasis omitted). As to the first basis, the plaintiff must produce evidence showing that the reasons given by the employer simply did not happen, *i.e.*, the reasons are factually false. *Id.* As to the second basis, more than "the bare bone elements of plaintiff's *prima facie* case" is required. *Id.* Under these circumstances:

> [T]he plaintiff admits the factual basis underlying the employer's proffered explanation and further admits that such conduct *could* motivate dismissal. The plaintiff's attack on the credibility of the proffered explanation is, instead, an indirect one. In such cases, the plaintiff attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was *more* likely than that offered by the defendant. In other words, the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup.

*Id.* (emphasis in the original). "[I]n order to make this type of rebuttal showing, the plaintiff may not rely simply upon his *prima facie* evidence but must, instead, introduce additional evidence of . . . discrimination." *Id.* As to the third basis, plaintiff must produce evidence showing "that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." *Id. See also Gray*, 263 F.3d at 600-602.

Summary judgment in favor of a defendant is appropriate where the plaintiff fails to establish a *prima facie* case or is unable to demonstrate pretext sufficient to rebut the defendant's legitimate, non-discriminatory reasons. *Barnhart v. Peckrel, Schaeffer & Ebeling Co.,* 12 F.3d 1382, 1395 (6th Cir. 1993). "The ultimate burden of persuasion remains with the plaintiff to prove that the employer's reasons were a pretext for discrimination *and* that the employer intended to discriminate on the basis of race." *Thurman*, 90 F.3d at 1166 (emphasis in the original) (citing *St. Mary's Honor Center*, 509 U.S. 502, 113 (1993)). The finder of fact may infer discrimination from the elements of a prima facie case, coupled with its disbelief of the

14

rationale articulated by the employer. *See Hicks,* 509 U.S. at 511 ("The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons, will permit the trier of fact to infer the ultimate fact of intentional discrimination . . . 'no additional proof of discrimination is required. . . .'). *See also Barnett v. Department of Veterans Affairs,* 153 F.3d 338, 341 (6th Cir. 1998); *E.E.O.C. v. Yenkin-Majestic Paint Corp.,* 112 F.3d 831, 835 (6th Cir. 1997); *Thurman,* 90 F.3d at 1166-67.

The record fails to disclose any direct evidence of intentional discrimination on the part of defendants for purposes of plaintiff's prima facie case. With respect to the circumstantial showing of discrimination, it is undisputed that plaintiff is African American and a member of the protected class for his race discrimination claim under state law. It is also undisputed that plaintiff was qualified for the position lost and suffered an adverse employment action by being terminated. However, plaintiff fails to present evidence satisfying the fourth prong of his prima facie case of employment discrimination. Plaintiff alleges in his memorandum in opposition to the motion for summary judgment that he was replaced by Joseph Hanna, a white male, following his termination. (Doc. 23 at 8). Plaintiff cites to his own affidavit in support of this assertion. The Court has carefully reviewed all thirteen paragraphs of plaintiff's affidavit. Plaintiff's affidavit does not state he was replaced by a non-African American employee. Plaintiff has offered no admissible evidence that he was replaced by an individual outside of the protected class and may not rely on the unsupported allegations in his memorandum. In the absence of any such evidence, plaintiff fails to establish his prima facie case of discrimination as

15

a matter of law and defendants are entitled to summary judgment on this claim. *Mitchell*, 964 F.2d at 582-84.

## IV. Defendants' motion for summary judgment on plaintiff's retaliation claim is denied.

State law prohibits an employer from retaliating against an employee for complaining about discrimination. Ohio Rev. Code § 4112.02(I).[1] Plaintiff's state law retaliation claim is analyzed under the same *McDonnell Douglas* burden shifting analysis as his race discrimination claim. *See Imwalle v. Reliance Medical Products, Inc.,* 515 F.3d 531, 544 (6th Cir. 2008).

To establish a prima facie case of retaliation, plaintiff must show that: (1) he engaged in an activity protected by Title VII; (2) the defendant knew he engaged in this protected activity; (3) thereafter, the defendant took an employment action adverse to him; and (4) there was a causal connection between the protected activity and the adverse employment action. *Smith v. City of Salem, Ohio*, 378 F.3d 566, 570 (6th Cir. 2004) (citing *DiCarlo v. Potter*, 358 F.3d 408, 420 (6th Cir. 2004)). "To establish the causal connection that the fourth prong requires, the plaintiff must produce sufficient evidence from which one could draw an inference that the employer would not have taken the adverse action against the plaintiff had the plaintiff not engaged in activity that Title VII protects." *Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 543 (6th Cir. 2003) (citing *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000); *EEOC v. Avery Dennison Corp.,* 104 F.3d 858, 861 (6th Cir.1997)(holding that a plaintiff need only present "'sufficient evidence to raise the inference that her protected activity was the likely

---

[1]Section 4112.02(I) provides that it is unlawful:

For any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section or because that person has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revised Code.

reason for the adverse action'" to establish the causation element)). "The burden of establishing a *prima facie* case in a retaliation action is not onerous, but one easily met." *Nguyen,* 229 F.3d at 563.

Defendants contend that plaintiff has failed to establish the fourth element of his prima facie case of causation. Defendants argue there is no link between plaintiff's termination on July 7, 2006, and his December 12, 2005 email complaining of harassment, his March 31, 2006 email complaining of harassment and a hostile work environment, or his charge of discrimination filed with the EEOC on April 27, 2006. The Court disagrees.

To establish causation, plaintiff need only produce sufficient evidence from which the jury could infer that defendants would not have terminated his employment had plaintiff not filed an EEO complaint. *Abbott,* 348 F.3d at 543. Plaintiff was fired because defendants concluded he was dishonest and failed to cooperate in with the internal investigation of his complaints of discrimination. The investigatory process was initiated only after plaintiff complained of discrimination. Thus, defendants would not have taken the adverse action against plaintiff had plaintiff not complained about discrimination at PNC in the first place. If not for his initial complaints, there would have been no internal EEO investigation and no basis upon which to terminate plaintiff's employment. A reasonable jury could infer from this evidence that PNC would not have terminated plaintiff's employment had he not engaged in protected activity.

In addition, the timing in this matter also supports an inference of retaliation for purposes of the causation element of plaintiff's prima facie case. There were approximately four months between plaintiff's March 31 complaints and his termination. *See, e.g., Bryson v. Regis Corp.,* 498 F.3d 561, 571 (6th Cir. 2007) (finding that three months between plaintiff's request for leave

17

and termination satisfies the prima facie case of retaliation). "Although temporal proximity alone will not support an inference in the face of compelling evidence to the contrary, the proximity in time between protected activity and adverse employment action may give rise to an inference of a causal connection." *Ford v. Gen. Motors Corp.*, 305 F.3d 545, 554-55 (6th Cir. 2002) (internal citations omitted). The close temporal proximity between plaintiff's complaints and his discharge supports an inference of a causal connection between his protected activity and the adverse employment action taken against him. When viewed in a light most favorable to plaintiff, plaintiff has presented sufficient evidence from which a reasonable jury could find that a causal connection exists between plaintiff's complaints of discriminatory treatment and his termination. Therefore, plaintiff has established a prima facie case of retaliatory discharge.

Defendants also seek summary judgment on the basis that plaintiff has failed to establish the reasons proffered by PNC for his termination were a pretext for discrimination. Plaintiff contends that the reasons posited by defendants for his termination are pretextual because they had no basis in fact. *Manzer*, 29 F.3d at 1083.

Defendants present evidence that plaintiff was fired because he lied and failed to cooperate with investigators during an internal EEO investigation. Defendants assert that plaintiff's misrepresentation of the facts of the March 31 incident and subsequent events constitutes lying in violation of PNC policies. Defendants contend that plaintiff's own deposition testimony establishes he was non-cooperative and not completely honest with PNC's employee relations representatives and manager, and that his complaints of discrimination cannot shield him from legitimate disciplinary actions.

On the other hand, plaintiff presents evidence defendants Haynes and Weinkam were untruthful and distorted his statements in the process of the EEO investigation in an attempt to cover up discrimination. Plaintiff's evidence shows he attempted to cooperate in the investigation and only requested that communications be in writing when he believed his words to Weinkam and Atkinson were being misconstrued and distorted to give a false impression about his willingness to cooperate in the investigation.

The issue of plaintiff's cooperation, as well as that of his truthfulness, are issues of fact which necessarily depend on the credibility of the parties involved in this dispute. Contrary to defendants' contention, plaintiff's deposition testimony purporting to concede his failure to cooperate and not being "completely honest" with PNC's employee relations personnel who investigated is not as clear cut as defendants claim. In the Court's view, the essential facts upon which PNC allegedly relied for its termination decision depend on whose version of the events of March 31 and June 19, 2006, as well as subsequent events, the jury ultimately credits.

Plaintiff presents sufficient evidence from which a jury could infer that defendants' reasons for terminating plaintiff's employment were pretextual. Plaintiff's version of the events of March 31 and June 19, when viewed in conjunction with his affidavit and emails, the evidence that Haynes badgered plaintiff to quit and his refusal to do so, Haynes' refusal to intervene in the March 31 dispute between plaintiff and Ms. Demann which led up to the June 19 disciplinary warning, and the racial incidents set forth in the Stephens and Houston affidavits, is sufficient evidence from which a reasonable jury could conclude that defendants' reasons for terminating plaintiff were a pretext for discrimination. If the jury ultimately believes that plaintiff was not dishonest and did not fail to cooperate, then a termination based on "false" reasons would be

tantamount to firing plaintiff in retaliation for his complaints about discrimination. When the evidence is viewed in the light most favorable to plaintiff, a reasonable jury could infer that defendants' proffered reasons for plaintiff's termination were a pretext for discrimination and in retaliation for his complaints of discrimination. Therefore, defendants' motion for summary judgment on plaintiff's retaliation claim is denied.

## V. Defendants' motion for summary judgment on plaintiff's Family and Medical Leave Act claim is granted.

The Family Medical Leave Act ("FMLA") entitles an employee up to 12 weeks of leave per year if the employee has a "serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). An employer is prohibited interfering with, restraining, or denying rights provided to employees under the provisions of the Act. 29 U.S.C. §2615(a)(1). In addition, employers may not retaliate or discriminate against employees who have taken FMLA leave and may not use the taking of FMLA leave as a factor in the termination of an employee. 29 U.S.C. § 2915(a)(2); *Arban v. West Publishing Corp.*, 345 F.3d 390, 401 (6th Cir. 2003); *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 314 (6th Cir. 2001).

Plaintiff's complaint alleges that he left his PNC employment on medical leave on March 30, 2006,[2] completed the necessary papers for FMLA leave, and was approved. The complaint alleges that his physician approved his return to work as of May 15, 2006, but when he reported for duty he was not permitted to return to work. (Doc. 3, ¶¶12-16),

---

[2]The evidence presented on summary judgment shows plaintiff left the bank on March 31, and not March 30, as alleged in the complaint.

20

Defendants seek summary judgment on plaintiff's FMLA claim, alleging plaintiff was not an "eligible employee" for FMLA purposes when he went on medical leave in March 2006 because he had not yet been employed for a full 12 months. (Doc. 21 at 15). An employee must be considered "eligible" to be covered under the FMLA. 29 U.S.C. § 2611(2). "To be 'eligible' under the FMLA, an employee must have been employed by the employer at issue for the preceding twelve months and must have put in at least 1,250 'hours of service' during that time." *Mutchler v. Dunlap Memorial Hosp.*, 485 F.3d 854, 857 (6th Cir. 2007) (citing 29 U.S.C. § 2611(2)(A); 29 C.F.R. § 825.110(a)).

Plaintiff began his employment with PNC on June 20, 2005. Plaintiff had not yet been employed by PNC for a full 12 months when he went on leave on March 31, 2006, or when he sought to return from leave on May 15, 2006. Thus, plaintiff was not an "eligible" employee for purposes of FMLA coverage for the claim alleged in his complaint.

In response to the motion for summary judgment, plaintiff now states he is not arguing he had a right to FMLA leave as of March 31, 2006, but rather that he was eligible for and denied FMLA leave as of June 21, 2006, when he faxed to Peggy Atkinson Dr. Mayel's letter excusing plaintiff from work for an addition seven days. (Doc. 23 at 10). Plaintiff states Atkinson accused him of falsifying the document instead of asking if he needed FMLA leave and that his subsequent request to James Popp on June 23, 2006 requesting "all proper disability" documents was ignored. (Doc. 23 at 10, Exhs. G, F). Plaintiff asserts he should have received FMLA leave from June 21, 2006 until his discharge on July 7, 2006.

Defendants object to plaintiff's belated attempt to add a new FMLA claim in this case. Defendants assert that plaintiff's complaint does not allege a claim for the denial of FMLA

benefits as of June 21, 2006. Defendants also point out that plaintiff has not filed a motion to amend the complaint and argue that he should not be permitted to do so at this late juncture. (Doc. 24 at 4).

Plaintiff's complaint does not allege an FMLA claim based on the alleged denial of FMLA benefits as of June 21, 2006. Nor has plaintiff moved to amend his complaint to include such a claim. Although leave to amend a complaint shall be "freely given when justice so requires," a party must act with due diligence in seeking a amendment under Rule 15(a), Fed. R. Civ. P. *See Spadafore v. Gardner*, 330 F.3d 849, 852-53 (6th Cir. 2003) (citing *United States v. Midwest Suspension & Brake*, 49 F.3d 1197, 1202 (6th Cir. 1995)). In addition, Rule 15(a) must be read in conjunction with Federal Rule 16(b), which requires a district court to enter a scheduling order limiting the time to amend pleadings and provides that such order shall not be modified "except upon a showing of good cause." Fed. R. Civ. P. 16(b). "Once the scheduling order's deadline passes, a plaintiff first must show good cause under Rule 16(b) for failure earlier to seek leave to amend before a court will consider whether amendment is proper under Rule 15(a)." *Leary v. Daeschner*, 349 F.3d 888, 909 (6th Cir. 2003). In the absence of a motion to amend filed by plaintiff, the Court is unable to determine whether plaintiff meets the "due diligence" and "good cause" requirements of Rules 15(a) and 16(b). *See Tucker v. Middleburg-Legacy Place*, 539 F.3d 545 (6th Cir. 2008) (employee not entitled to leave to amend complaint against employer to remedy defects in FMLA action where employee failed to proffer a motion to amend or proposed amendment). Moreover, the Court notes that the factual basis for plaintiff's June 21 FMLA claim existed and was known to plaintiff at the beginning of this lawsuit. Thus, the Court does not construe the complaint as raising a claim for the denial of FMLA benefits as

22

of June 21, 2006. Accordingly, the FMLA claim asserted in plaintiff's complaint fails as a matter of law and defendants are entitled to summary judgment on this claim.

For the foregoing reasons, defendants' motion for summary judgment is **DENIED** with respect to plaintiff's retaliation claim, but **GRANTED** with respect to plaintiff's race discrimination, hostile work environment, and FMLA claims.

**IT IS SO ORDERED.**

Date: 7/28/09

Timothy S. Hogan
United States Magistrate Judge